J-S73030-18
J-S73046-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: M.B.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: G.B.-C., NATURAL MOTHER | No. 1152 WDA 2018 |

Appeal from the Order Entered July 12, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):
DP-21-2011
NO. 54 AD 2014

| IN RE: S.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: G.B.-C., NATURAL MOTHER | No. 1153 WDA 2018 |

Appeal from the Order Entered July 12, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 65 for the year 2013
No. 54A AD 2014

| IN RE: Z.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: G.B.-C., NATURAL MOTHER | No. 1154 WDA 2018 |

Appeal from the Order Entered July 12, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): No. 54B AD 2014

| IN RE: E.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: G.B.-C., NATURAL MOTHER | No. 1155 WDA 2018 |

Appeal from the Order Entered July 12, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 54C AD 2014

J-S73030-18
J-S73046-18

IN RE: Z.C., A MINOR

APPEAL OF: K.C., NATURAL FATHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1156 WDA 2018

Appeal from the Order Entered July 12, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 2014 AD 54B

IN RE: E.C., A MINOR

APPEAL OF: K.C., NATURAL FATHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1157 WDA 2018

Appeal from the Order Entered July 12, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 2014 AD 54C

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and OLSON, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED MARCH 07, 2019**

G.B.-C. ("Mother) and K.C. ("Father") appeal from the July 12, 2018 orders reinstating the decrees entered on July 19, 2017, that granted the petitions filed by Blair County Children, Youth and Families ("BCCYF") to involuntarily terminate their parental rights to Mother's four minor children and Father's two minor children, pursuant to sections 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] After careful review of the record and applicable law, we affirm.

---

[1] For ease of disposition, we consolidate the appeals at Nos. 1152-1155 WDA 2018 and Nos. 1156 – 1157 WDA 2018 *sua sponte*, as the issues in both matters involve the same parties and are closely related.

- 2 -

This case arose out of dependency proceedings involving minors, M.B.F. (born in January of 2010), S.B. (born in September of 2011), Z.C. (born in December of 2012), and E.C. (born in June of 2015) (collectively "Children"). J.F. is the biological father of M.B.F. and S.B.,[2] while Father is the biological father of Z.C. and E.C. The trial court summarized the procedural history of this matter, as follows:

> The Honorable Jolene Grubb Kopriva, former President Judge of the Blair County Court of Common Pleas, presided over the dependency proceedings prior to her retirement to Senior Judge status on December 31, 2017. On July 19, 2017, Judge Kopriva granted petitions filed by [BCCYF] involuntarily terminating the parental rights of [Mother and Father] to the subject children. [] Mother and Father … appealed from the [termination] decrees entered [on] July 19, 2017.
>
> In an opinion filed June 8, 2018, the Pennsylvania Superior Court, in a non-precedential decision, remanded the matter back to Blair County, directing that [the orphans' court] appoint legal counsel for the subject children and conduct additional proceedings consistent with the Superior Court's memorandum. Upon such remand, this case was assigned to [the Honorable Timothy M. Sullivan].
>
> In response to the Superior Court's memorandum, we appointed Attorney Susan P. Rea to serve as legal counsel for all four subject children by order entered June 12, 2018. We conducted an additional on-the-record proceeding on July 3, 2018. Based upon the record adduced during such proceeding, we make the following [findings]:
>
> 1. In response to the holding of the Pennsylvania Supreme Court in the case of ***In re Adoption of L.B.M.***, 1616 A.3d 172 (Pa. 2017), the Blair County Court of Common Pleas has established a panel of attorneys to serve as legal counsel for children in termination of parental rights ["TPR"]

_____

[2] The trial court terminated the parental rights of J.F. to M.B.F. and S.B. on July 5, 2017; however, J.F. has not filed an appeal.

proceedings. Each of the attorneys that comprise this panel have professional experience in dependency proceedings and/or in serving as legal counsel for children in contested TPR proceedings.

2. Attorney Susan P. Rea was appointed to represent the legal interest of the subject four children by order entered June 12, 2018.

3. Attorney Rea has been involved in Blair County dependency proceedings since the mid-to-late 1970's when the [BCCYF] formed a multi-disciplinary team. She served as a guardian *ad litem* for dependent children for many years. She then served as a master/hearing officer for dependency proceedings until approximately two to three years ago.

4. Upon her appointment as legal counsel, Attorney Rea reviewed documents received from the BCCYF caseworker, and had an extensive telephone conversation with the children's GAL, Attorney Mary Ann Probst, concerning the history of this case. Attorney Rea has dealt with Attorney Probst in a professional manner over the many years that she served as a master/hearing officer and Attorney Probst has served as a GAL. Attorney Rea expressed great respect for Attorney Probst's professional competency and her involvement with the children.

5. Attorney Rea also spoke to [M.B.F.'s] counselor by phone at length as to her perception and discussions with [M.B.F.] relative to the child's personal understanding and feelings. The counselor indicated that [M.B.F.] has a "very good grasp of the need for himself to be safe." [M.B.F.] loves his mother and expresses concern as to his mother's own safety. The counselor confirmed that [M.B.F.] "is safe where he is and he knows that is where he needs to be and he is very happy in that placement."

6. Attorney Rea also spoke to [M.B.F.'s] foster mother and [M.B.F.] by FaceTime, since the family was going on vacation. In speaking to [M.B.F.], Attorney Rea noted that he is a quite mature 8 year old child and that he was very happy to speak to her. [M.B.F.] personally confirmed what the counselor had previously advised, *i.e.*, that he very much likes where he is and he looks forward to being part of that family." [M.B.F.] mentioned "that he will have five

- 4 -

siblings … instead of just three and he seems pretty happy about that."

7. Attorney Rea also spoke by phone with the play therapist for [S.B.] and [Z.C.], however, such play therapist could not provide any specific information as to the children's preferred outcomes since such is not an issue that is addressed through play therapy.

8. On the date of [the] hearing, Attorney Rea personally met with [S.B.], [Z.C.], and [E.C.].  She found [S.B.] to be very shy and very young, being only 6 years of age.  [S.B.] confirmed with Attorney Rea that she is happy in her current placement.

9. [Z.C.], who is only 5 years of age, and [E.C.], who is just 3 years of age, did discuss their desire to remain in their "forever home[,"] and to be part of their foster family.

10. Attorney Rea confirmed that "[a]ll in all, … the children are very much positive with the idea of adoption and having permanent families[.] … [T]heir wishes are consistent with the termination proceeding and the recommendations that have been made in this case heretofore."

11. Attorney Rea also confirmed that she was provided enough opportunity to review the record and that her discussions with all four children and the counselors was [*sic*] sufficient for her to state their preferred outcomes.  She added that the children were "very, very clear that they are very happy where they are and want to stay where they are so that much is very clear."

12. It was Attorney Rea's professional recommendation that we reinstate the TPR decrees and that there was no need for an additional evidentiary hearing.  She did not believe that such additional hearing would be of any benefit to the subject children.

13. Attorney Rea also confirmed that the fact that [Father], the biological father of [Z.C.] and [E.C.], has relocated from Florida to Pennsylvania, would have no effect concerning her recommendation.  It was acknowledged that this relocation occurred *after* entry of the TPR decrees by Judge Kopriva.

14. Attorney Rea also confirmed that [S.B.], [Z.C.,] and [E.C.] did not make any comments concerning their biological parents. [M.B.F.] related that he would like to see his mom from time to time, but that he did not know where she was and he never expressed a desire to live with her.

15. Attorney Rea reported that [M.B.F.] "really likes that [pre-adoptive] family and said that he wanted to stay there." He talked about his new brother and sister and that he would have 5 siblings now.

Therefore, in consideration of the above, we find that Attorney Rea sufficiently reviewed the record concerning this matter; that she had the opportunity to speak to all four [] subject children, as well as two different counselors and the foster mother of the oldest child. Attorney Rea is able to advance the children's legal interests and/or preferred outcomes relative to the termination proceedings. We find *that the children's legal interest and preferred outcomes are consistent and aligned with their best interests*, as previously advanced by Attorney Probst, their GAL. Therefore, we find that a new hearing is *not* necessary to advocate separate preferred outcomes or placements on behalf of the children.

Trial Court Opinion and Order, 7/12/18, at 1-7 ("TCO I") (unnecessary capitalization and citations to record omitted; emphasis in original).

In light of the foregoing findings, the trial court entered an order on July 12, 2018, which reinstated the decrees previously entered on July 19, 2017, involuntarily terminating the parental rights of Mother and Father to Children, pursuant to section 2511(a)(2), (5), (8) and (b) of the Adoption Act. Mother and Father filed separate, timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). They now raise the following issues on appeal:

I.   Whether the trial court erred and/or abused its discretion in terminating the parental rights of Mother and Father to their

respective Children, pursuant to 23 Pa.C.S. § 2511(a)(2), (a)(5), and (a)(8)?

II.  Whether the trial court erred and/or abused its discretion in terminating the parental rights of Mother and Father to their respective Children, pursuant to 23 Pa.C.S. § 2511(b)?

**See** Mother's Brief at 5-6; **see also** Father's Brief at 4.  Father also presents the following additional issue for our review:  "Whether or not the trial court erred in reinstating the prior decree[s] when newly appointed legal counsel did not have sufficient information or time to prepare?"  **See** Father's Brief at 4.

Before we address the merits of the issues raised by Mother and Father, we review the factual background of this matter, which was previously summarized by the trial court in its Pa.R.A.P. 1925(a) opinion:

> The dependency records begin essentially with a February 16, 2011 Shelter Care Hearing regarding the only child born at that time, [M.B.F.].  It involved [Mother] and her paramour [J.F.], father of [M.B.F.]
>
> Essentially, dependency proceedings resulted from the fact … [M]other and [J.F.] were 16 year-old children raising a very young child.  [Mother] lived in foster care with [M.B.F.], and [Mother] was pregnant with their second child[,] [S.B.].  BCCYF had worked diligently for the first year of [M.B.F.'s] life to assist this young family with support; however, the instability and chaos reached a crescendo in early 2011[,] and the court found dependency on March 21, 2011[,] upon the hearing officer's recommendation of March 16, 2011.
>
> Despite efforts of BCCYF to successfully reunite [Mother] with her mother, Veronica, the record indicates [Mother's] return home resulted in a rough transition and then improved a bit between [Mother] and [Veronica]; however, [S.B.] was born September 9, 2011[,] which increased the stressors for this family and at the 12-month permanency review on January 30, 2012, BCCYF revealed they had just learned Veronica suffered eviction and surreptiously [*sic*] moved her entire family ([Mother, M.B.F.,

and newborn S.B.]) to California. BCCYF terminated supervision accordingly that same date.

Approximately 18-months later[,] on June 20, 2013[,] BCCYF received a near fatality childline notice involving [Mother] and her children.

Both [M.B.F.] and [S.B.] had ingested medication, per the shelter care petition. [Mother] and [Father] tried to manage the condition of the children through their own means (fearful they might lose the children to BCCYF) and by the time they sought help, the children's conditions had worsened to life-threatening. The children were life-flighted to Pittsburgh and eventually recovered.

Between California and this shelter care incident, [Mother] had entered a relationship with [Father] and they had a child together, [Z.C.], born [in] December [of] 2012. All three children were placed in foster care.[2] On July 3, 2013, the [c]ourt adjudicated the children dependent and reunification services began. At a 6-month review on December 11, 2013, [BCCYF] testified they had made an indicated finding against both [Father] and [Mother]; however, the reunification seemed on track with [Mother] visiting regularly and the children enjoying the time with their mother.

[2] [Z.C.] was placed in foster care immediately by emergency protective order[,] and [M.B.F.] and [S.B. were placed] after release from the hospital.

[BCCYF] … pursue[d] a finding of child abuse and a motion for aggravated circumstances with the parents. After [a] hearing on May 14, 2014, this court affirmed the indicated finding, but took note that the young age of [M]other, the remorse she demonstrated and her own chaotic childhood led the court to find the incident at that point[] was an isolated instance of poor judgment and worthy of future expungement. We saw no point in creating more obstacles for [] Mother to overcome. Additionally, we made the same type of recommendation with our finding of aggravated circumstances with [M]other and [F]ather, stating such was not to be used for any future termination of parental rights purposes as we saw the matter, again, as an isolated instance of poor judgment.

At the 12-month review held [on] May 12, 2014, [BCCYF] had returned custody to [M]other and she had separated from

- 8 -

[Father,] which appeared to be a better arrangement for [Mother]. She had custody of all 3 children, was working and had some stability at that time. However, just one month later, BCCYF filed their 3rd shelter care petition for this family on June 27, 2014[,] alleging [M.B.F.] had unexplained bruises on his face and [M]other had multiple explanations, all inconsistent with each other. Again, the children returned to foster care. Mother and [F]ather continued close and regular contact with their children, although the foster home available for the 3 children existed 1.5 hours away from Blair County creating extensive travel time to keep regular connections and creating a sacrifice for all involved. At the 18-month permanency review[,] the court learned [Mother] and [Father] had reunited, joint reunification with the children progressed, and [F]ather had started drug and alcohol treatment; Mother was scheduled to begin EMDR (trauma therapy) as part of her individual therapy and the goal remained [to] return home.

Unfortunately, at the February 17, 2015 status conference[,] the service providers noted that with increased contact with the parents, the stressors increased with the children's unmanageable behavior. Visits were reduced to 1 child at a time to regain some stability and management of behavior. [Mother] was pregnant with another child, her counseling was progressing slowly and providers noted that the parents lacked insight, and had few coping skills or parenting techniques. The children had become aggressive with each other which created new safety concerns, particularly with another baby to arrive. At the request of the court, the agency switched reunification providers and at the October 20, 2015 30-month review for [M.B.F.], the 24-month review for [S.B.,] and the 17-month review for [Z.C.,][3] the court learned the family responded positively to the new provider. The following status conference of February 10, 2016 indicated both [M]other and [F]ather had jobs at Taco Bell with an accommodating boss, [M]other had made some progress in therapy and the children were doing well in school, which gave the busy parents some respite time.

[3] The fourth child[, E.C.] was born [in] June [of] 2015[,] and [BCCYF] did not pursue dependency at that time.

At the May 9, 2016 36-month review[,] the court determined sufficient progress existed with increased parenting capacities and stability to terminate supervision. The bonding of the children to their parents have [*sic*] always existed.

Unfortunately, the apparent progress was abruptly interrupted 4 [] months later with a 4th shelter care petition filed[on] September 9, 2016[,] as [M.B.F.] ingested seven times his prescribed medication. [Mother] had again separated from [Father], had placed the medication on the top of the refrigerator and while she was sleeping, [M.B.F.] climbed up [] on the refrigerator and took the medication "extra" because he wanted to be a good boy in school that day. BCCYF placed [Z.C.] and [E.C.] in the custody of [Father] and [M.B.F.] and [S.B.], again[,] went into foster care.

This court conducted an adjudicatory hearing on February 7, 2017 and March 15, 2017[,] resulting in an order of adjudication of dependency as to all 4 children. The facts supporting dependency (which was not appealed) also give rise, in part, to the *second* petition for termination of parental rights filed a week later [on] March 23, 2017.[4]

> [4] BCCYF filed [its] first petition for termination of parental rights on October 15, 2015; however, on November 25, 2015[,] BCCYF requested to withdraw their petitions for the 3 children born at that time, [M.B.F.], [S.B.,] and [Z.C.,] and the court granted such withdrawal that same date.

Trial Court Opinion, 10/18/17, at 2-7 ("TCO II") (unnecessary capitalization omitted; emphasis in original).

We review the instant appeal from the termination of Mother's and Father's parental rights under the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, … 34 A.3d 1, 51 (Pa.

- 10 -

2011); **Christianson v. Ely**, … 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id.**

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, … 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re S.H.**, 879 A.2d 802, 806 (Pa. Super. 2005). We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

**In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

- 11 -

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decrees pursuant to sections 2511(a)(2) and (b), which provide as follows:

**(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights

of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating the parental rights of Mother and Father pursuant to section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

- 13 -

***In re K.Z.S.***, 946 A.2d 753, 759 (Pa. Super. 2008).

> Moreover, this Court has previously stated:

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

***Id.*** Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." ***In re A.S.***, 11 A.3d 473, 481 (Pa. Super. 2010).

Instantly, Mother and Father argue that the court erred in terminating their parental rights to their respective Children. Both parties claim that they had remedied the conditions that led to the placement of Children. ***See*** Mother's Brief at 9; Father's Brief at 9. After careful review, however, we discern that the record clearly belies these claims.

In support of its decision to terminate the parental rights of Mother and Father, the trial court opined:

> Despite the numerous services and support provided to these parents over a lengthy period of time ([Mother] since 2011, [Father] since mid-2013)[,] a pattern has developed, establishing that the conditions that led to the removal and placement of these children continue to exist and that these parents, despite assistance reasonably available, are not likely to remedy in a reasonable period of time the conditions that have led to placement. The first Petition to Terminate Parental Rights filed October 15, 2014 (subsequently withdrawn) and the Second Petition to Terminate Parental Rights filed March 23, 2017[,] both provide extensive detail of [BCCYF's] attempts to provide assistance with providers and services to help stabilize the young

- 14 -

family and assist both [M]other and Father to overcome the abusive and challenging childhoods they individually experienced. The glimpses of progress that occurred gave hope that sustainability would be possible with some continued perseverance. However, staying true to the mission of keeping families together has its boundaries as well. The four shelter care petitions, all resulting in dependency, give evidence of lack of parenting capacities that result in ongoing danger and threats to the welfare of these young children.

The fact that the harrowing experience of a near fatality with [M.B.F.] and [S.B.] regarding medication ingestion does not lead [M]other to have [M.B.F.'s] medication in a protected area from an overactive child like [M.B.F.], gives indication that [M]other lacks the capacity to learn, grow and understand the basic threats she presents to her children.

Although [Father] did not reside with [Mother] when the last incident recurred with [M.B.F.], he received custody of [Z.C.] and [E.C.] as a result of the incident in [the] fall of 2016. He demonstrated instability with housing[,] moving the children from relatives to friends without planning and forethought and demonstrated an inability to support himself and care for his own needs[,] which in [a] short time resulted in removal of the children from his care through dependency proceedings.

TCO II at 8-10 (footnote omitted).

The court further summarized the extensive testimony given by witnesses at the termination hearing, which provide additional support for its decision:

**Alison Seltzer** – Therapist for [Mother] and [S.B.]

Ms. Seltzer testified that [Mother] has had difficulty with any progress with her past trauma, since the chaos and instability of her everyday life make it difficult to elevate therapy from crisis mode. It has also interfered with consistent attendance.

The 4th Shelter Care Petition resulting in the fourth loss of her children has caused grief and loss for [Mother] which also interferes with any progress and/or attendance. Mother was searching for employment and the primary goal was to move forward in some fashion.

**Racqual White** – FICS (Family Intervention Crisis Services) Reunification Worker as of November 2016.

Ms. White testified she began visits between [M]other and children in December of 2016 in the FICS Office two times per week for two hours and moved the visits to [Mother's] home in March [of] 2017 for the same amount of time. Mother was regular in her attendance, but apprehensive and defensive when she tried to take parenting feedback. In March [of] 2017, [M]other missed a visit and Ms. White asked for a wellness check by the police, due to the unusual nature of [M]other's absence. This pattern continued through June and Ms. White reported [M]other took medication for her depression and Ms. White found [M]other unfocused, experiencing side effects of the medication and having difficulty processing events and information. Taco Bell fired Mother, her gas had been shut off and her rent situation was handled "temporarily" with her landlord. Mother had not progressed from Step 1 in the reunification process (in a 3-step program). Mother has expressed she believes [M.B.F.] presents the problem, not her parenting.

Mother has better management of the children's behavior when she has only 2 children at a time, especially due to the challenging behavior of [M.B.F.] and [Z.C.]

**Shelly McCune** – Supervisor for FICS Reunification Services for Mother.

Ms. McCune supervised this family reunification in both 2013 and 2016. In 2013, Mother was very receptive. In 2016[,] the process became more difficult for [Mother]. Her mental health now overshadows the parenting issues. [Mother] has stated it gets harder each time she loses her children. The entire process is traumatizing to her. Ms. McCune can see the deterioration in [] [M]other and has encouraged [her] to take care of her own needs first.

**Diane Litzinger** – [BCCYF] Supervisor.

Ms. Litzinger was on emergency duty the evening of the medication overdoes with [M.B.F.] and [S.B.] in 2013 and had primary involvement with the 2nd medication incident with [M.B.F.] She has dealt closely with this family and in fact the dependency records indicate Mr. [*sic*] Litzinger had contact with [M]other as a foster child in the BCCYF System.

- 16 -

Ms. Litzinger over the years described the various "breakups" between [Mother] and [Father], their volatile relationship even when together and the contributing factors of [F]ather's untreated drug and alcohol issues and Mother's continuing mental health issues.

We divert from our summary of Ms. Litzinger['s] testimony to indicate, after the [M.B.F.] medication ingestion, [F]ather had custody of [Z.C.] and [E.C.] under a safety plan. BCCYF filed a shelter care petition involving [F]ather [on] October 27, 2016[,] alleging [F]ather had violated the plan by allowing [Z.C.] and [E.C.] to stay overnight with [M]other (an indicated perpetrator) when [Father's] cousin could no longer provide shelter for [Father] and the children due to HUD regulations. The parents did not notify BCCYF of the quandary and could find no … alternatives other than to violate the plan for their crisis regarding placement of the children.

[Z.C.] and [E.C.] were removed and placed in foster care on October 27, 2016. The court conducted [an] adjudicatory dependency hearing on March 23, 2017.

Returning to the testimony of Ms. Litzinger, [] [F]ather lost all contact with BCCYF after October [of] 2016. [Father's] mother, Annette DeBolt, (a potential adoptive resource for [E.C.] and [Z.C.] has indicated that after a visit to Pennsylvania in late 2016, [F]ather returned to Florida to reside with her. She has started the ICPC process in Florida and as a result[,] [F]ather has found his own apartment, has employment and has scheduled drug and alcohol treatment.

[**Mother**]

[Mother] testified that she could care for 2 children, but with 4 would need support, she could not do it alone. She testified that [M.B.F.] "scares her" and [she] just wants him to have a safe place. She would like to keep [E.C.] and [Z.C.] and has concerns for [S.B.] and her chronic urinating behavior.

She testified the last separation occurred when [Father] and she had a fight and he just "up and left[,]" which seemed to affect [S.B.'s] behavior as it was upsetting to her daughter. She has a new boyfriend, found some work and continues to see her therapist while keeping visits with the children and contact with the foster parents.

[**Father**] - Father of [E.C.] and [Z.C.]

> Father agrees he abruptly left Pennsylvania and lost all contact with children…. He had no insight on what impact that behavior could have had on the well-being of his children. He believes Florida is a better place for him emotionally and environmentally. He would agree with his [m]other['s] adopting the children so he could have contact with them. Otherwise, he has no alternative plan [for] how to restore physical contact with the children or care for their custody at this time. He enjoys and appreciates limited phone contact at this time.

*Id.* at 10-14.

> Based on the foregoing, the trial court concluded:

> The testimony [at the termination hearings] … clearly indicates both [Mother] and [Father] continue to struggle as they have for … more than 6 months since the last dependency proceedings (and for over 3 years otherwise) with their own life issues with little stability to offer themselves or their children. Despite their unquestioned love for their children, the obstacles they face emotionally and individually interfere with their ability to grow the parenting capacity to care for the needs and welfare of their children. Unfortunately, the pattern has continued despite multiple support efforts. This pattern has caused the children to be without essential parental care and control for the physical and mental well-being of the children.

> ***

> Based upon the extensive record, we find more than clear and convincing evidence that BCCYF has offered reasonable assistance and the parents, sadly, cannot remedy the conditions which led to the placement of their children.

*Id.* at 15-16. We deem the court's decision to terminate the parental rights of Mother and Father pursuant to section 2511(a)(2) to be well-supported by the record.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b)

are met. ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but the focus is on the child pursuant to section 2511(b). ***Id.*** at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

Instantly, both Mother and Father insist that they have a strong bond with Children and argue that the court erred in severing that bond. ***See*** Mother's Brief at 9; Father's Brief at 9. Mother further avers that the testimony offered by all parties regarding the nature of her relationship with Children was "unequivocally positive" and that severing the parent-child bond would result in emotional harm to Children. Mother's Brief at 22-25.

While the trial court recognized the existence of a parental bond, the court concluded that Children's need for permanency and consistency outweighed any attachment Children have with Mother and Father. In support

of its decision to terminate the parental rights of Mother and Father pursuant

to section 2511(b), the trial court opined:

> The testimony of providers and Dr. O'Hara all confirm that the children have great love for and a bond with their mother. It was that love and bonding that gave great pause in the past to changing direction from reunification. However, the testimony demonstrates beyond any doubt, that the children have suffered greatly from the pattern of instability through four different separations and implosions of their family. Testimony at the June 5, 2017 hearing indicated [S.B.] continues in therapy, struggles with grieving the loss of her mother and the abrupt loss of [Father], the only father figure she has known, and needs permanency and certainty which her family cannot give her. Each trauma she experiences causes regression and although she is the most stable when Mother and Father are together, that has apparently [been] disrupted more than the record can actually prove or [S.B.] can even know....

> [M.B.F.] continues his treatment and has made progress. The foster home (pre-adoptive extended family) has seen progress as well as the therapist. [M.B.F.] has learned to manage his emotions and reduce his temper outbursts. [S.B.] provides a large trigger for [M.B.F.] and he does much better without that daily tension of living with her.

> [Z.C.] also undergoes therapy for processing emotions and managing behavior. The therapist has seen improvements with [Z.C.] and has seen some problem solving develop as a skill. [Z.C.] just started therapy April 2017 and the focus is on immediate behavior, but it appears he likely has had past trauma that will need some work. The foster parents reported that when 4-year old [Z.C.] arrived at their home[,] he could not count to 20 and did not know his ABC's. He qualifies for special services with the IU8 preschool and has stabilized in their home significantly over the months of his placement.

> [E.C.] was only 11 months old at the 4th shelter care proceeding. She was born into a family dealing with BCCYF and 3 other dependent children. The termination of supervision lasted only a 4-month period before the family chaos erupted. She was placed with [Father] which resulted in more chaos and then soon thereafter, foster care. Although she has not exhibited the effects

- 20 -

of her parent[s'] incapacities to this point, her parents' needs and incapacities remain under the same analysis. She has been without the parental care and control for over 6 months and the conditions as stated by Dr. O'Hara are not likely to change for an extended time, if at all.

As to all 4 children, we cannot, in good conscience, continue this attempt at reunification any longer. The children clearly need permanency and consistency in their lives, to grow and reach the most potential each one has. Giving primary consideration to their developmental, physical and emotional needs and welfare, we have no choice but to go forward and find permanency with others and also with a sensitivity to an ongoing relationship with their mother and father to supplement their new forever home.

TCO II at 17-19.

In further support of the trial court's decision, BCCYF added:

[T]here is no question that [Mother] has some attachment to her children. The difficulty in this case is that the children's need for permanency, safety and stability outweighs any attachment with [] [M]other…. [T]he record reflects that all four children's lives have lacked stability with [Mother]. The children have been subject to repeated acts of abuse, neglect and lack of supervision. The record supports that this has led the older three children to all have emotional issues which require counseling. [E.C.] is the only one – due to her young age – that has not required counseling. Nevertheless, the record supports that [M]other has not and cannot remedy the dysfunctional environment for her children in the foreseeable future. As a result, [E.C.'s] safety and stability has been affected just as much as the other children.

BCCYF's Brief at 40-41.

Moreover, with regard to Father, BCCYF stated:

Similar to the situation with [Mother], … there is some evidence of record that [Father] had some attachment to [Z.C.] and [E.C.] The difficulty in this case is that the children's need for permanency, safety and stability outweighs any attachment they had with their father…. [T]he record reflects that [Z.C.] and [E.C.] have lacked stability with [Father]. The children have been subject to or been present for repeated acts of abuse, neglect and lack of supervision. The record supports that this has led [Z.C.]

to have emotional issues which require counseling. [E.C.] – due to her young age – has not required counseling. Nevertheless, the record supports that [Father] has not and cannot remedy the dysfunctional environment for his children in the foreseeable future. As a result, [E.C.'s] safety and stability has been affected just as much as the other children.

…

Additionally, although [Father] had maintained some phone contact with [Z.C.,] it was clear that this was not sufficient to maintain a bond with him. Further[,] a relationship with [E.C.] by phone was not feasible given her age. [Father] made no reasonable arrangements to maintain a bond or place in his children's lives before he left for Florida. He knew the children were in placement, but he abandoned them to meet his own needs.

*Id.* at 43-44.

As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Children's needs and welfare, and the absence of any beneficial bond with Mother or Father, we conclude that the court did not abuse its discretion as to section 2511(b). **See S.P.**, 47 A.3d at 826-27.

Finally, we address Father's claim regarding whether Attorney Rea had sufficient information available to her and/or spent enough time with Children to make a determination as to whether an additional hearing was necessary. Father alleges that Attorney Rea rushed to comply with this Court's June 12, 2018 order, and that her appointment was "a mere pretext rather than affording [Children] the protections and representation the appointment was intended to provide." Father's Brief at 12-13. To the contrary, the record provides sufficient evidence that Attorney Rea properly assessed the legal

interests of Children, as reflected in the trial court's findings of fact set forth herein. **See** TCO I, supra. We deem Father's claim to be wholly without merit.

Accordingly, we affirm the orders terminating the parental rights of Mother and Father to their respective Children.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/7/2019